## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

NORTHEAST UTILITIES SERVICE
  COMPANY and THE CONNECTICUT
  LIGHT AND POWER COMPANY,

            Plaintiffs,

    v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY and UTICA
MUTUAL INSURANCE COMPANY,

         Defendants.

3:08-CV-01673 (CSH)

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

HAIGHT, Senior District Judge:

## I.     INTRODUCTION AND RELEVANT FACTS

In the present action, plaintiffs Northeast Utilities Service Company and The Connecticut

Light & Power Company seek declaratory judgments and compensatory damages for breach of

contract against defendants St. Paul Fire & Marine Insurance Company ("St. Paul") and Utica

Mutual Insurance Company ("Utica").  This dispute arises from a tragic explosion in an underground

vault which injured two men working there, Elias Anchundia and Scott Schmukler, bringing about

Anchundia's death.  What is at issue in this action is whether Plaintiffs are entitled to indemnity and

defense from Defendants for their liabilities in connection with these injuries.  Plaintiffs filed a

Motion for Summary Judgment [Doc. 39] on all counts of the Third Amended Complaint, while

Utica and St. Paul each filed its own cross-Motion for Summary Judgment [Docs. 45, 49

-1-

respectively] against all of Plaintiffs' claims.

All three Motions raise the same issues, so they may be dealt with as a group in this Ruling. The parties do not disagree about the facts relevant to this action; they disagree only on whether coverage exists under two insurance policies. Those are questions of law. In consequence, the case is appropriate for summary disposition.

The relevant facts are set forth in detail in the parties' briefs, and only a summary is provided here. Plaintiffs, public utilities, are wholly owned subsidiaries of Northeast Utilities ("NU"). They entered into a Master Services Agreement (the "Contract") with American Electrical Testing Co. ("AET"), under which AET agreed to furnish supervision, labor, material, and equipment to perform network protector maintenance in the Waterbury, Connecticut area. The Contract required AET to acquire Comprehensive or Commercial General Liability Coverage to cover bodily injury and property damage and to endorse the relevant policies to include Plaintiffs as additional insureds. Contract ¶ 17.1.[1]

AET complied with this contractual insurance requirement by acquiring two policies (collectively, the "Policies") from Defendants. The primary policy, issued by Utica to AET for the period from August 1, 2006 to August 2, 2007 (the "Utica Policy"), included coverage for certain bodily injury or property damage up to $1 million per occurrence.[2]   It  included coverage for additional insureds, that is, entities or individuals different from and in addition to AET, but such coverage attaches only if one of two conditions is satisfied.   General Liability Extension

_____

[1] A copy of the Contract is attached to the Affidavit of Linda G. Bennett [Doc. 48] as Continued Exhibit A.

[2] A copy of the Utica Policy is attached to Plaintiffs' Local Rule 56(a)(1) Statement ("Pl. L.R. Stmt.") [Doc. 41] as Exhibits 5, 5.1, 5.2 and 5.3.

Endorsement § 11(a)(1).[3]  The interpretation of one of those conditions is the most important point of dispute between the parties.  That provision establishes coverage for an additional insured, to the extent that such additional insured is held liable for AET's acts or omissions arising out of its work for the additional insured.  *Id.* § 11(a)(1)(a).  The Utica Policy also excludes coverage for the "independent acts or omissions of such additional insured."  *Id.* § 11(c)(1).

The excess policy, issued by St. Paul for the period from August 1, 2006 to August 1, 2007 (the "St. Paul Policy"), covers the insured for liability for certain bodily injury and property damage that is in excess of the Retained Limit (in this case, the coverage limit of the Utica Policy) up to $5 million per occurrence.[4]  Coverage is available only if the primary policy applies.  St. Paul Policy I-A, I-B and I-C.  The St. Paul Policy contains a provision establishing St. Paul's duty to defend when the Retained Limit has been exhausted by payment of covered judgments or settlements.  *Id.* II-A and II-B.  Under that provision, St. Paul has no duty to defend against any claim not covered by the policy.  *Id.* II-C.

On February 21, 2007, two of AET's employees, Anchundia[5] and Schmukler, provided maintenance at an electrical vault in Waterbury, Connecticut owned by Plaintiffs (the "Vault").  For reasons that cannot be determined from the record in the present action, an explosion occurred, injuring both employees and bringing about the death of Anchundia. Anchundia's widow Marlyn

---

[3] A copy of the General Liability Extension Endorsement constitutes Pl. L.R. Stmt. Exhibit 5.3.

[4] A copy of the St. Paul Policy is attached to St. Paul's Local Rule 56(a)(1) Statement [Doc. 42] as Exhibit 1.

[5] Throughout, "Anchundia" refers to decedent Elias Anchundia.  His widow, Marlyn Anchundia, is referred to as "Marlyn Anchundia."

Anchundia filed a federal action against Plaintiffs in the Eastern District of New York, alleging that the explosion was caused by Plaintiffs' negligence. *Anchundia v. N.E. Utils. Serv. Co.*, No. 2:07-cv-04446 (E.D.N.Y.) (the "Anchundia Action").   Schmukler filed an action against Plaintiffs in Connecticut Superior Court making the same allegation. *Schmukler v. N.E. Utils.*, No. HHB-CV-09-5011836 (the "Schmukler Action") (collectively, the "Underlying Actions").   In neither action did the plaintiff allege negligence or acts by AET; rather, they alleged that the explosion was caused by Plaintiffs' acts and omissions.   In each action, Plaintiffs filed affirmative defenses alleging the negligence of others, including Anchundia and Schmukler.

Plaintiffs demanded that Defendants provide defense and indemnity in the Underlying Actions.   Defendants, however, responded that Plaintiffs' losses from the Underlying Actions are not covered by the Policies.

Plaintiffs initially filed the present action in Connecticut Superior Court.   Defendants removed it to this Court on November 4, 2008, on the basis of the complete diversity of the parties. On May 20, 2009, Plaintiffs filed the Third Amended Complaint, which is the operative complaint, seeking declarations that the subject losses are covered by the Policies and damages for breach of contract.   The parties subsequently filed the present cross-motions for summary disposition.

The Anchundia Action was settled on or about January 4, 2011 for $8 million.  Plaintiffs assert that the total legal expenses that they incurred in the Anchundia Action came to $1,546,458.47.  The Schmukler Action was settled on or about June 20, 2011 for $55,000.  Plaintiffs assert that their total legal expenses in that action were $14,811.51.   Affidavit of Duncan Ross MacKay [Doc. 70] ¶¶ 4-9.   Between June 5 and June 8, 2012, the parties filed supplemental briefs at the Court's request [Docs. 72, 74, 76], which, *inter alia*, informed the Court about the settlement

of the Underlying Actions.

As a result of Plaintiffs' settlements of the Underlying Actions, the present posture of the case is as follows: (1) by reason of Defendants' duties to defend Plaintiffs as stated in the Policies, Plaintiffs assert that they are entitled to recover from Defendants the legal expenses they incurred in connection with the two Underlying Actions; and (2) by reason of Defendants' duties to indemnify Plaintiffs as stated in the Policies, Plaintiffs are entitled to recover from Defendants the amounts they paid to settle the two Underlying Actions.

Defendants assert that they owe Plaintiffs nothing under the Policies, because the incidents and events giving rise to the Underlying Actions are not covered by the primary policy (Utica) and consequently cannot be covered by the excess policy (St. Paul).

These questions of coverage lie at the heart of this action, and form the basis for the parties' cross-motions for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  In moving for summary judgment against a party which will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim.  *Celotex* at 322-23.  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242,

249 (1986).

The Court will first consider the parties' arguments about the duty to indemnify, and then consider their arguments about the duty to defend.  Because the resolution of these issues renders judgment as a matter of law appropriate on all claims in this action, the Court will then rule on all three Motions for Summary Judgment.

## III.   DUTY TO INDEMNIFY

### A.   Utica

#### 1.   Existence of Coverage Under the "Additional Insureds" Provision

The central issue between the parties is whether Plaintiffs' liability in the Underlying Actions falls within the "additional insureds" provision of the Utica Policy.  The Utica Policy states that "[w]e will pay those sums that the insured [AET] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Utica Policy, Commercial General Liability Coverage Form, § I(A)(1)(a).[6]  As noted *supra*, the Utica Policy extends this coverage to additional insureds by Section 11 of a General Liability Extension Endorsement (the "Endorsement").[7]  Since the dispute between the parties turns largely on that provision, it is worth quoting the relevant part of Section 11 in full:

> Any person or organization with whom you [AET] have entered into a written contract, agreement or permit requiring you to provide insurance such as is afforded by this Commercial General Liability Coverage Form will be an additional insured, but only:
>   (a) To the extent that such additional insured is held liable for your acts or omissions arising out of and in the course of ongoing operations performed by you or your subcontractors for such additional insured; or

---

[6]  The Commercial General Liability Coverage Form can be found near the end of Pl. L. R. Ex. 5.  Neither of the Policies is paginated as a whole.

[7]  The General Liability Extension Endorsement constitutes Pl. L. R. Ex. 5.3.

(b) With respect to property owned or used by, or rented or leased to, you.

Endorsement § 11a(1).

The parties are in agreement that Plaintiffs are organizations with which AET entered into a contract requiring it to provide insurance such as that provided by the Utica Policy.  Thus far, Plaintiffs appear to be "additional insureds" and entitled to coverage.  However, they are "additional insureds" only if either condition (a) or condition (b) applies.  Plaintiffs do not claim that condition (b) applies.  Their argument is exclusively that they are covered under condition (a).  Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment on All Counts of the Third Amended Complaint ("Pl. Supp. Memo.") at 11-14.

Condition (a) applies to liability for AET's acts or omissions arising out of AET's work for Plaintiffs.  To establish that they are covered under condition (a), Plaintiffs argue that any liability that may attach to them in the Underlying Actions would necessarily be the result of AET's "acts or omissions arising out of and in the course of" AET's work for them.  *Id.* at 11.  Defendants, however, argue that the Underlying Actions had nothing to do with AET's acts and omissions, but rather alleged acts and omissions by Plaintiffs themselves.  *See, e.g.,* Memorandum of the Defendant, Utica Mutual Insurance Company, in Support of its Motion for Summary Judgment ("Utica Supp. Memo."), sixth and seventh pages.[8]

Under Connecticut law, unambiguous terms in an insurance contract are given their plain and ordinary meaning.  *Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 255 Conn. 295, 305 (2001).  The plain and ordinary meaning of "for your acts or omissions," in a policy in which the word "you" refers to AET, is "for AET's acts or omissions" rather than for any other party's acts or omissions.

---

[8]  Utica's brief in support of its Motion is not paginated.

Thus, the primary dispute between the parties turns on a single, simple question: when Plaintiffs settled with Marlyn Anchundia and Schmukler, did they pay that $8,055,000 based on their liability for AET's acts or omissions?  If so, there is coverage.  If those payments were based on Plaintiffs' own acts or omissions, there is no coverage.

Plaintiffs, in their memorandum describing the settlements, do not state that the settlement agreements established that Plaintiffs were paying based on anything other than the liability claimed in the Underlying Actions.  Plaintiffs' Supplemental Memorandum in Support of Plaintiffs' Position on Three Pending Motions for Summary Judgment ("Pl. Supplemental Memo.") *passim*.  They do not provide any basis for the settlement payments other than their alleged liability in the Underlying Actions.  The Court must proceed on the assumption that the basis for the settlement payments was the liability alleged in the Underlying Actions.

The complaints in the Underlying Actions allege that Plaintiffs were liable for their own acts and omissions.  The Amended Complaint in the Anchundia Action contains three causes of action, for (1) Anchundia's injuries, (2) Anchundia's wrongful death, and (3) Marlyn Anchundia's loss of Anchundia's services.[9]  All three are based on allegations of Plaintiffs' own acts or omissions.  "The aforesaid accident was caused solely and wholly through the negligence of the defendant, NORTHEAST UTILITIES and/or CT LIGHT & POWER, its agents, servants, and/or employees, in that it was careless and negligent in its operation, control, custody, charge, supervision, management and maintenance of the aforementioned Job Site, as well as the work being performed thereat ..."  Anchundia Comp. ¶ 33.  The Anchundia Complaint proceeds to list sixteen other ways

---

[9]  A copy of the Amended Complaint in the Anchundia Action ("Anchundia Comp.") is attached to the Third Amended Complaint in this action [Doc. 29] as Exhibit A.

in which Plaintiffs were allegedly negligent.  *Id.*  "By reason of the foregoing carelessness and negligence of the defendants, their agents and/or servants and/or employees, the defendants caused, precipitated and/or hastened the death of plaintiff's decedent on February 21, 2007."  *Id.* at ¶ 40.  "As a result of the negligence of defendants, plaintiff, MARLYN L. ANCHUNDIA, has sustained damage in the loss of services, companionship, consortium and affection of her husband, decedent, ELIAS JOSEPH ANCHUNDIA ..."  *Id.* at ¶ 46.

The Complaint in the Schmukler Action likewise alleges that Plaintiffs are liable for their own acts or omissions.[10]  The Complaint starts its description of the cause of Schmukler's injuries by stating that "Plaintiff's injuries and losses were caused by the carelessness and negligence of Defendants in one or more of the following ways: ... a.  In that they used, permitted and/or allowed a hazardous, defective and unlawful condition to be, continue and remain on the Job Site."  Schmukler Comp. at 9.  It proceeds to list eighteen further ways in which Plaintiffs' negligence allegedly caused Schmukler's injuries.  *Id.*

Neither complaint alleges that Plaintiffs are liable for AET's acts or omissions.  The Anchundia Complaint does allege that Plaintiffs' negligence may include the negligence of their "agents," along with their "servants," "employees" and themselves.  Anchundia Comp. ¶ 33.  This raises the question of whether AET could be considered to be Plaintiffs' "agent" for the purposes of the Anchundia Action.  The Anchundia Complaint does not allege so, on the face of it.  The closest it comes to doing so is in the allegation that Plaintiffs "managed the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's

---

[10]  A copy of the Complaint in the Schmukler Action ("Schmukler Comp.") is attached to the Third Amended Complaint in this action [Doc. 29] as Exhibit C.

decedent's accident ..." *Id*.  ¶ 21.  But the Anchundia Complaint goes to great lengths to make it clear that it is alleging Plaintiffs' own acts, as opposed to acts of AET that might be imputed to Plaintiffs.  For example, Paragraphs 25-32 read as follows:

> 25.    At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, directed the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

> 26.    At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER,  supervised the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

> 27.    At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, controlled and/or managed the work, labor and services being performed by [AET] at the Job Site and the Electric Project, which led to and caused plaintiff's decedent's accident, the injuries he sustained therein and ultimately his death.

> 28.    At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, had a presence at the Job Site, and more particularly, at the Electric Project, on a continual basis.

> 29.    At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, had its supervisory personnel, laborers and other employees performing work, labor, services and other functions at the Job Site.

> 30.    At all times and places hereinafter mentioned defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, had the authority and the degree of control over the work which produced the accident, plaintiff's decedent's injuries and ultimate death, to enable it to take the action necessary to correct or avoid the unsafe condition.

> 31.    Prior to the date of the aforesaid action defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, either had knowledge, or should have had knowledge, that the subject Job Site and Electric Project, including the transformer maintenance and sampling of insulating fluids from energized high voltage primary switch compartments was dangerous under the circumstances then and there presenting.

> 32.    The defendants NORTHEAST UTILITIES and/or CT LIGHT & POWER, were aware of similar prior instances of accidents and/or explosions, as well as problems

-10-

and/or issues obtain [sic.] insulating fluid samples from the energized high voltage primary switch compartment, which occurred under the same or similar circumstances, and the defendants failed to take appropriate precautionary measures to prevent and/or minimize the subject accident.

Marlyn Anchundia could hardly have done more to make it clear that she was alleging that the negligence at issue was that of Plaintiffs themselves, rather than being the negligence of AET acting as Plaintiffs' agent. The Anchundia Complaint alleged no acts or omissions on AET's part, other than the general assertion that it "was performing work, labor and services as to the aforementioned Electric Project." Anchundia Comp. ¶ 17. The only employee of AET mentioned is Anchundia himself. *Id.* ¶¶ 18-20. The Anchundia Complaint certainly does not allege that AET's acts or omissions caused the explosion via Anchundia's acts or omissions, for it specifically denies that Anchundia's acts or omissions played any role: "Said accident was the result of the negligence of [Plaintiffs] and occurred without any negligence on the part of plaintiff's decedent contributing thereto." *Id.* ¶ 34.

Plaintiffs have advanced two arguments for treating the liability in the Underlying Actions as liability for AET's acts or omissions. First, they assert that "[i]f [Plaintiffs] are held 'liable' ... it will necessarily be for AET's acts or omissions because the accident arose when AET workers were performing (or not performing) certain work in conjunction with AET's contract with [Plaintiffs]." Plaintiffs' Reply Brief Responding to Defendant Utica Mutual Insurance Company's Opposition to Plaintiff's Motion for Summary Judgment ("Pl. Reply Memo.") at 2.

That statement makes one wonder if Plaintiffs doubt the intelligence of the Court. The fact that the accident arose when AET workers were performing work under the Contract does not "necessarily" mean that Plaintiffs' liability must be for AET's acts or omissions. Plaintiffs seem to

-11-

expect the Court to believe that because AET workers were present at the Vault at the time of the explosion, it was impossible for Marlyn Anchundia or Schmukler to allege that acts or omissions of any party other than AET caused the explosion.  But that is exactly what they alleged.  Marlyn Anchundia, for example, alleged that Plaintiffs had their own "presence" and their own "supervisory personnel, laborers and other employees" at the Vault.  Anchundia Comp. ¶¶ 28-29.  As another example, she alleged that Plaintiffs– not AET but Plaintiffs– "caus[ed] and permitt[ed] electric current to flow into and out of the area occupied by [Anchundia]."  Anchundia Comp. ¶ 33.  Schmukler made essentially the same allegations.  Schmukler Comp. ¶ 9.

Second, Plaintiffs argue that the Underlying Actions are covered because Plaintiffs filed affirmative defenses that alleged that the explosion was caused by the acts or omissions of AET, Anchundia, Schmukler, and others.  Pl. Reply Memo. at 5-6.  But Anchundia and Schmukler could not have obtained damages from Plaintiffs for vicarious liability for AET's acts based solely on Plaintiffs' own affirmative defenses.  If Plaintiffs' argument were correct, by filing those affirmative defenses they would have been creating vicarious liability for themselves where it did not otherwise exist.  In any event, the Underlying Actions have been settled.  Plaintiffs do not suggest to the Court that they paid those settlements because of liability they imposed on themselves through their affirmative defenses, rather than because of the claims that Marlyn Anchundia and Schmukler brought against them.

Plaintiffs might argue that although the Underlying Actions did not allege AET's acts or omissions or contain any causes of action seeking to impose on Plaintiffs vicarious liability for AET's acts or omissions, the ultimate resolution of those actions might have imposed liability on them based on such vicarious liability, after one or both of the Anchundia and Schmukler complaints

was amended.  But now that the Underlying Actions have been terminated by settlements, that danger no longer exists.

For the most part, Plaintiffs focus on another issue: the "arising out of" language in Section 11a(1)(a) of the Endorsement.   Under that section, an additional insured is covered only if both (1) such additional insured is held liable for AET's acts or omissions and (2) AET's acts or omissions arose out of and in the course of ongoing operations performed by AET or its subcontractors for such additional insured.  Plaintiffs focus attention on the "arising out of" condition.  Pl. Supp. Memo. at 11-14.  And indeed, if Plaintiffs faced liability for AET's acts or omissions, it would likely be true that those acts or omissions "arose out of" ongoing operations that AET performed for Plaintiffs. But Plaintiffs did not face liability for AET's acts or omissions.

For that reason, Plaintiffs' reliance on the Connecticut Superior Court's decision in the *Royal Indemnity* matter is unavailing.  *See* Pl. Supp. Memo. at 13-14.  In that case, the Superior Court found coverage under somewhat similar circumstances in a decision that was explicitly affirmed and adopted by the Connecticut Supreme Court. *Royal Indem. Co. v. Terra Firma,* 50 Conn. Supp. 563 (Conn. Super. Ct. July 25, 2006); *Royal Indem. Co. v. Terra Firma*, 287 Conn. 183, 189 (2008).[11] However, the policy at issue in *Royal Indemnity* differed in a crucial respect from the Utica Policy. The coverage in the *Royal Indemnity* policy extended to "liability arising out of ... [the insured's] work." *Royal Indemnity,* 50 Conn. Supp. at 569.  Under that policy, as long as the liability arose out of the insured's work for the additional insured, it did not matter whose acts or omissions caused the accident.  In the Utica Policy, on the other hand, the coverage extends only to liability arising out of

_____

[11]   The parties are in agreement that the issues in this action are governed by Connecticut law.

-13-

AET's acts or omissions. *Royal Indemnity* did not deal with language limiting coverage to liability for the insured's acts or omissions.[12]

The point that *Royal Indemnity* establishes is that if Plaintiffs *were* held liable for AET's acts or omissions, those acts or omissions would meet the criterion of "arising out of" AET's work for Plaintiffs. Connecticut law, as the *Royal Indemnity* court observed, defines "arising out of" broadly to cover any case in which the injury "was connected with, had its origins in, grew out of, flowed from, or was incident to" the occurrence in question. *QSP v. Aetna Cas. & Surety Co.*, 256 Conn. 343, 373-34 (2001). But that point has no significance here, because Plaintiffs' liability, as alleged in the Underlying Actions, was not liability for AET's acts or omissions.

This is not a matter of adhering to the precise language of a policy in defiance of fairness or common sense. The restriction of coverage to AET's acts or omissions simply fits the fact that the Utica Policy was AET's policy, not Plaintiffs' policy. AET included additional-insured coverage in the Utica Policy to meet its undertaking in the Contract to protect Plaintiffs, but AET was not obliged to purchase insurance to protect Plaintiffs against their own conduct.

Likewise, public policy does not ban enforcement of the plain language of the Utica Policy. Provisions extending an additional insured's coverage only to the insured's acts, rather than to its own acts, have been enforced. *See, e.g., Smurfit-Stone Container Enters., Inc. v. Nat'l Interstate Ins. Co.*, No. 3:08CV093, 2008 WL 4153762, at *3-5 (E.D.Va. Sept. 5, 2008) (Missouri law); *Cleveland v. Vandra Bros. Constr., Inc.*, 948 N.E.2d 1027, 1032-33 (Ohio App. Ct. 2011) (Ohio

---

[12] In other decisions that have found that additional insureds were covered under "arising out of" clauses, the courts confronted provisions like the one in *Royal Indemnity*: they spoke of "liability arising out of" the insured's work rather than liability "for the insured's acts or omissions arising out of" such work. *See Town of Manchester v. Vermont Mut. Ins. Co.*, No. CV044004859, 2006 WL 164886 (Conn. Super. Ct. Jan. 3, 2006) (collecting cases).

law).  As the *Smurfit-Stone* court explained, that limitation suits the purpose of additional-insured coverage:

> Courts in Missouri and elsewhere have recognized that a common purpose of an additional-insured provision is to "provide ... protection from vicarious liability and to provide "specialized protection rather than all-encompassing coverage."  *U.S. Fidelity & Guar. v. Drazic*, 877 S.W.2d 140, 143 (Mo. Ct. App. 1994); *accord Northbrook Ins. v. American States Ins.*, 495 N.W.2d 450, 453 (Minn. Ct. App. 1993) (recognizing that "One of the primary functions of the additional insured endorsement is to protect the additional insured from vicarious liability for acts of the named insured"); *Harbor Ins. Co. v. Lewis*, 562 F.Supp. 800, 803 (E.D.Pa. 1983) (concluding that "In the insurance industry, additional insureds provisions have a well established meaning.  They are intended to protect parties who are not named insureds from exposure to vicarious liability for acts of the named insured").

*Smurfit-Stone* at *3.  Here, the plain language of Section 11(a)(1)(a) is consistent with the common purpose of such policies: protecting the additional insured against vicarious liability.

The Utica Policy thus, by its terms, does not provide indemnity for Plaintiffs' liability in the Underlying Actions.  Although this alone would be enough to decide the indemnity issue, the Court addresses the very similar issue of the independent acts exclusion.

## 2.    The "Independent Acts" Exclusion

The Utica Policy contains an exclusion for "independent acts or omissions" by the additional insured, as noted above.  The courts have not supplied an interpretation of that language under Connecticut law.   (There was no "independent acts" exclusion in the policy at issue in *Royal Indemnity.*)  However, the law of other states consistently supports the position that the "independent acts" exclusion limits coverage to instances in which the additional insured's alleged liability is based on vicarious liability for the insured's acts, excluding instances in which the additional insured's alleged liability is based solely on its own conduct.  *Edwards v. Brambles Equip. Servs., Inc.*, 75 Fed.Appx. 929, 932 (5th Cir. 2003) (Louisiana law); *United Constr. Ent. Co. of St. Louis v.*

*Am. Contractors Ins. Grp., Inc.*, No. 10-CV-81, 2011 WL 1258557, at *5-7 (S.D.Ill. Mar. 21, 2011) (Illinois law); *St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co.*, 187 F.Supp.2d 584, 594-95 (E.D.N.C. 2000) (North Carolina law).

Some courts have held that when the complaint against the additional insured includes counts alleging liability for its own independent acts or omissions and also counts for which its liability would be vicarious, the insurer has a duty to defend, and possibly to indemnify. *Greyhound Lines, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 11-P-86, 2012 WL 987515, at *2-3 (Mass. App. Ct. Mar. 26, 2012) (Massachusetts law); *Amerisure Mut. Ins. Co. v. Travelers Lloyds Ins. Co.*, No. H-09-663, 2010 WL 1068087, at *7 (S.D.Tex. Mar. 22, 2010) (Texas law). However, in the present case the Underlying Actions sought to impose liability on Plaintiffs exclusively for their independent acts and omissions.

Plaintiffs argue that a holding that the "independent acts" language excludes coverage "requires a finding regarding the acts and omissions that might have caused or contributed to the accident." Plaintiffs' Memorandum in Opposition to Defendant Utica Mutual Insurance Company's Motion for Summary Judgment ("Pl. Utica Opp. Memo.") at 8. While that might be true in some cases, it is not true here. None of the causes of action in the Anchundia or Schmukler complaints could have resulted in Plaintiffs being held vicariously liable for AET's acts or omissions, no matter what finding was made about the acts or omissions that contributed to the accident. Now that the Underlying Actions have been settled, there is no possibility that the Anchundia or Schmukler complaint will be amended to allege vicarious liability, or that a court will make a factual finding of vicarious liability. Thus, even if liability in the Underlying Actions was covered by the insuring

-16-

agreement, it would have been excluded by the independent acts exclusion.[13]

**B.      St. Paul**

Because Utica does not have a duty to indemnify, neither does St. Paul, the excess carrier. The St. Paul Policy contains the following provision: "There is no coverage under this policy for Bodily Injury ... unless a Retained Limit applies."   St. Paul Policy, Insuring Agreements I(A).  The Retained Limit here is the limit of Utica's primary insurance coverage, so the absence of coverage under the Utica Policy establishes the absence of coverage under the St. Paul Policy.  There is one exception to the requirement that a Retained Limit apply, at I(B)(3).  But the Policy provides that "[i]f coverage for the Bodily Injury ... does not exist under any (1) Scheduled Underlying Insurance ... because of a specific exclusion or other specific coverage limitation, then paragraph I Coverage B.3 above does not apply, unless such coverage is specifically provided by endorsement to this policy."  *Id.* at I(C).   Here, as noted *supra*, there is no coverage under the Utica Policy under a specific exclusion and a specific coverage limit.  The St. Paul Policy contains no endorsement specifically providing coverage under I(B)(3).   Thus St. Paul has no duty to indemnify.[14]

_____

[13]  Utica's argument that Connecticut General Statutes § 52-572k bars coverage here ignores the fact that Section 52-572k does not extend to insurance contracts, as Plaintiffs observe.  Utica Supp. Memo., ninth and tenth pages; Pl. Reply Memo. at 17-19.

[14]  St. Paul makes two additional arguments, both of which are unpersuasive.  First, it argues that no "occurrence" is alleged as required by the St. Paul Policy because the last event in the causal chain that led to the explosion was the "transformer switch by CL&P."  Memorandum of Law of St. Paul Fire & Marine Insurance Company in Opposition to Plaintiffs' Motion for Summary Judgment ("St. Paul Opp. Memo.") at 17.  However, the parties have not presented the Court with evidence upon which it could make such a factual finding.  Second, it argues that the St. Paul Policy contains two provisions which exclude from coverage injury arising out of the rendering or failure to render of professional services, and that the Underlying Actions alleged that Plaintiffs failed to provide such services.  *Id.* at 19-20.  But the complaints in the Underlying Actions alleged several bases for Plaintiffs' liability, including, for example, strict liability for engaging in an "ultrahazardous activity."  Anchundia Comp. ¶¶ 49-62.  The Court cannot

IV.     **DUTY TO DEFEND**

A.      **Utica**

Plaintiffs argue that even if Utica does not have a duty to indemnify them, it did have a duty to defend them in the Underlying Actions.  Pl. Supp. Memo. at 15-18.  They argue further that because Utica breached its duty to defend them, it is liable for their defense costs and the amount of the settlements in the Underlying Actions.  *Id.* at 18-19.

As courts often observe, the duty to defend is broader than the duty to indemnify.  *See, e.g., Vermont Mut. Ins. Co. v. Walukiewicz*, 290 Conn. 582, 602 n. 21 (2009).  Unlike Utica's duty to indemnify, its duty to defend must be determined by considering the facts it knew at the time it refused to defend, regardless of later events.

The Connecticut Supreme Court has established that an insurer's duty to defend may arise either from the pleadings in the underlying action or from other facts known to it.  "If an allegation of the [underlying] complaint falls even possibly within the coverage, then the [insurer] must defend the insured."  *Wentland v. Am. Equity Ins. Co.*, 267 Conn. 592, 600 (2004).  The pleadings to be examined to determine coverage may include pleadings filed by the defendants.  *Vermont Mut. Ins. Co.* at 602 n. 21.  The duty to defend can arise from facts outside the allegations in the complaint if the insurer has actual knowledge of facts establishing a reasonable probability of coverage.  *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 274 Conn. 457, 466-67 (2005).

The Anchundia and Schmukler complaints did not allege any causes of action that might have fallen within the coverage of the Utica Policy.  As discussed *supra,* those complaints were based entirely on Plaintiffs' own acts rather than AET's.  Plaintiffs emphasize the fact that Plaintiffs'

conclude that nothing was at issue other than failure to render professional services.

affirmative defenses in the Anchundia and Schmukler Actions alleged other parties' negligence. Pl. Reply Memo. at 5-6.  That fact, however, does not bear on this analysis.  Utica's obligation was not to determine if some other party was negligent, but to determine if there was a possibility that Plaintiffs would be held liable for AET's acts or omissions.  Plaintiffs could not create otherwise nonexistent claims against themselves by pleading affirmative defenses.

Since the complaints in the Underlying Actions did not allege vicarious liability, the remaining question is whether Utica had "actual knowledge" of facts establishing a "reasonable probability" of coverage.  *See Hartford Cas. Ins. Co.* at 466-67.  That is, did it have reason to believe that the complaint in either of those actions might be amended to add claims against Plaintiffs based on vicarious liability for AET's conduct, and that Plaintiffs might be held liable under those claims?

To make that case, Plaintiffs would at a minimum have to show that there exists some cause of action under which such vicarious liability might have been imposed on them.  Nowhere in their six memoranda on the three Motions do Plaintiffs identify a cause of action that Marlyn Anchundia or Schmukler might have added to their complaints that would require Plaintiffs to pay for AET's acts or omissions.  Plaintiffs cannot establish that Utica had "actual knowledge" of such a potential cause of action when they themselves cannot identify one, even in retrospect.

Plaintiffs' argument on this subject is not easy to understand, but their fullest statement of that argument occurs in their memorandum in opposition to Utica's summary judgment motion.  Pl. Utica Opp. Memo. at 10, 14-16.  Plaintiffs argue that Utica knew of facts that showed that the claims were covered:

> By the underlying complaints, Utica knows that several AET workers allege that they were performing work in the vault at the time of the accident.  In their answers to the Anchundia and Schmukler complaints, [Plaintiffs] deny that they were negligent and assert the

negligence of others as affirmative defenses.

*Id.* at 10.  The phrase "several AET workers" is misleading, because in fact the complaints establish

only that one AET worker, Schmukler, alleges that he was performing work in the Vault, and only

one more, Anchundia, is alleged by others to have been there.  Later, expanding on this argument,

Plaintiffs add the following:

> Utica states that there are only three possible outcomes to the Anchundia and Schmukler
> cases: first, that [Plaintiffs] are found solely negligent; second, that Anchundia and/or
> Schmukler are found to have caused their own injuries either entirely or in a greater
> percentage than [Plaintiffs]; or third, that Anchundia and Schmukler and [Plaintiffs] are both
> found to be negligent ... under two of the three possible outcomes that Utica cites, the acts
> or omissions of AET's employees would have led to the injuries complained of.  Surely if
> two out of the three possible outcomes would include findings regarding the negligence of
> AET's employees, Utica has a duty to defend this action.

*Id.* at 15.

Although Plaintiffs are not clear about this, the situation they envision seems to be the

following: (1) Anchundia and Schmukler are found to have caused their own injuries, (2) since

Anchundia and Schmukler were employees of AET, their negligence is attributed to AET, (3) AET

is held liable to Marlyn Anchundia and Schmukler, and (4) Plaintiffs are held vicariously liable to

Marlyn Anchundia and Schmukler in place of AET.  In effect, they argue that Utica should have

anticipated that Plaintiffs would be held liable to Anchundia and Schmukler for Anchundia and

Schmukler's own negligence.  But Plaintiffs do not explain how that could come about.  In

particular, they do not explain why Utica would anticipate that Plaintiffs would be held liable for

AET's acts.  If there is an argument to be made here, Plaintiffs do not make it.

When Utica declined to provide Plaintiffs with a defense, it had no reason to believe that they

might be held liable for AET's acts or omissions.  Consequently, Utica had no duty to defend.

2.      **St. Paul**

As noted *supra*, the St. Paul Policy did not extend coverage beyond the coverage of the Utica Policy.  Thus, if Utica had no duty to defend, neither did St. Paul.

In addition, St. Paul argues that, as the excess carrier, it had no duty to defend until the $1 million coverage under the Utica Policy was exhausted.  Memorandum of Law in Support of Summary Judgment ("St. Paul Supp. Memo.") [Doc. 46] at 25-26.  The relevant language in the St. Paul Policy reads as follows: "Prior to the exhaustion of the Retained Limit we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any Claim or Suit seeking damages that would be covered by this policy."  St. Paul Policy, Insuring Agreements II(B).  Exhaustion occurs when "the Retained Limit has been exhausted by payment of judgments or settlements that would be covered by this policy."  *Id.*, II(A).  Thus, any duty to defend that St. Paul might have would arise only after the $1 million limit in the Utica Policy was exhausted.

Plaintiffs might argue that this limitation is impermissible under Connecticut law.  However, no Connecticut court has held that an excess carrier has a duty to defend regardless of policy language.  One Superior Court decision found no such duty.  "Underwriters, as an excess carrier, did not have a duty to defend." *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, No. X-02-CV-044001208, 2007 WL 447957, at *12 (Conn. Super. Ct. Jan. 25, 2007).  Another Superior Court decision also found that the excess carrier did not have, in general, a duty to defend before exhaustion of the underlying policy limit. *Fortin v. Hartford Underwriters Ins. Co.*, No. X-04-CV-030103483, 2005 WL 1083800, at *10-11 (Conn. Super. Ct. Apr. 6, 2005).  The court held that the excess carrier had the duty to defend the insured during a period when the primary insurer was not providing a defense, but that duty was based on a provision of the subject policy under which the excess carrier was

obligated to provide a defense for occurrences not covered by the primary policy.  The St. Paul Policy does not contain such a provision.  In fact, it contains the opposite provision: "We have no duty to defend, investigate or settle any Claim or Suit seeking damages not covered by this policy." St. Paul Policy, Insuring Agreements II(C).

Courts have also held that, under the law of other states, an excess carrier does not have a duty to defend before the retained limit has been exhausted.  *See* Allen D. Windt, *Insurance Claims & Disputes* § 4:11 (5th ed. 2012) (collecting cases).  For example, under New York law, the primary insurer has a duty to defend "without any entitlement to contribution from an excess insurer," and while an excess carrier may protect its interests by participating in a defense, "there is no obligation to do so."  *Gen. Motors Acceptance Corp. v. Nationwide Mut. Ins. Co.*, 828 N.E.2d 959, 961 (N.Y. 2005).  *See also Liberty Surplus Ins. Corp. v. Segal Co.*, 420 F.3d 65, 69 (2d Cir. 2005) (ruling that under New York law excess carrier did not have a duty to defend where the retained limit was not exhausted).

In the absence of contrary authority, the Court concludes that this limitation on the duty to defend is not impermissible under Connecticut law.  Consequently, if St. Paul had a duty to defend, it came into existence only when the Retained Limit was exhausted.

Plaintiffs have not established that any defense costs were incurred after the exhaustion of the Retained Limit.  Plaintiffs provide an affidavit from their deputy general counsel showing that their defense costs in the Underlying Actions were $1,512,471.28. MacKay Aff. ¶¶ 5-9.  However, that affidavit does not assert that any of those costs were incurred after exhaustion of the Retained Limit.  Nor do Plaintiffs assert that, after exhaustion, they asked St. Paul to provide a defense.

Plaintiffs have not presented to the Court any explanation or argument about the date of

exhaustion under the terms of the St. Paul Policy.  Does exhaustion occur only when Utica pays $1 million to Plaintiffs (which of course it has not)?  Does it occur when Plaintiffs have paid out the millionth dollar in defense costs?  Or does it occur when Plaintiffs pay the first $1 million in settlement to the plaintiffs in the Underlying Actions?  In the absence of such argument, even if the Court were to conclude that Plaintiffs' losses were covered, it could not conclude that the Retained Limit was ever exhausted and the excess carrier's duty to defend triggered.

Thus, both because of the absence of coverage under the St. Paul Policy, and because of St. Paul's status as an excess carrier, St. Paul did not breach a duty to defend.

## IV.    CONCLUSION

For all the foregoing reasons, Defendants had neither a duty to indemnify Plaintiffs nor a duty to defend them.  Plaintiffs cannot prevail on any of the eight counts in the Third Amended Complaint, each of which is based on the assertion that Defendants had such duties.  Thus, Defendants have shown that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law on all of Plaintiffs' claims.

Plaintiffs' Motion for Summary Judgment [Doc. 39] is DENIED, Utica's Motion for Summary Judgment [Doc. 45] is GRANTED, and St. Paul's Motion for Summary Judgment [Doc. 49] is GRANTED.  The Clerk is directed to enter judgment for Defendants and close the case.


It is SO ORDERED.
Dated: New Haven, Connecticut
        July 11, 2012

                        *Charles S. Haight, Jr.*
                        Charles S. Haight, Jr.
                        Senior United States District Judge